IN THE CIRCUIT COURT OF THE SIXTH JUDICIAL CIRCUIT
IN AND FOR PASCO COUNTY, FLORIDA
CIVIL DIVISION

MICHAEL E. MOECKER, as Receiver for
BOTFLY, LLC, DAVID R. LEWALSKI, and
JON J. HAMMILL,

      Plaintiff,

v.

ROBERT STEAD and
KELLY STEAD,

      Defendants.
_____/

Case No.: 512012CA 1372WS
Division: G

## COMPLAINT

Michael E. Moecker (the "**Receiver**"), as Receiver for Botfly, LLC ("**Botfly**"), David R. Lewalski ("**Lewalski**"); and Jon J. Hammill ("**Hammill**") (collectively the "**Receivership Entities**"), by and through counsel, sues the Defendants, Robert Stead and Kelly Stead, and alleges as follows:

## INTRODUCTION

1. This is an action to recover assets that were fraudulently transferred from Botfly to the Defendant, for unjust enrichment, for imposition of an equitable lien or a constructive trust and for disallowance of claim.

2. The Circuit Court of the Sixth Judicial Circuit for Pasco County, Florida (the "**Circuit Court**"), appointed Mr. Moecker as Receiver for the Receivership Entities by Order Appointing Receiver dated April 1, 2010.

3. The Circuit Court entered the Order Appointing Receiver in a civil enforcement action brought by the Office of the Attorney General ("**OAG**"), the Department of Legal Affairs,


EXHIBIT A

and the State of Florida in this Court styled, *Office of the Attorney General v. Bo fly, LLC et aL,* Case No. 51-2010- CA-2912-WS/G (the "**Enforcement Action**").

4. The OAG brought the Enforcement Action pursuant to the Florida Securities and Investor Protection Act, Fla. Stat. §§ 517.011 et seq. and the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201 et seq.

5. In accordance with the Order Appointing Receiver, the Receiver filed with the Circuit Court an Oath of Receiver accepting the appointment and agreeing to faithfully discharge his duties, any subsequent directives from the Circuit Court, and applicable law.

6. Under the Order Appointing Receiver, the Receiver was directed to marshal, preserve, protect, maintain, manage, and safeguard the Receivership Entities' assets in a reasonable, prudent, diligent, and efficient manner. The Receiver was vested with the usual powers and duties of equity Receivers in like cases and was authorized and instructed to take possession of and control over the Receivership Entities' assets.

7. The Receiver is empowered to file suits to recover property of the Receivership Entities including fraudulent conveyances and all causes of action of the Receivership Entities.

8. The Receiver brings this action to recover money transferred to the Defendants from the Receivership Entities.

## JURISDICTION AND VENUE

9. Defendants Robert Stead and Kelly Stead are sued individually and in a joint capacity with each other as husband and wife. Both are residents of the State of Indiana.

10. The Defendants are transferees of Botfly's funds or other property and are not bona fide holders for value.

11. Michael E. Moecker is the duly appointed and acting Receiver for the

Receivership Entities. The Receivership Entity on whose behalf the Receiver asserts the claims in this Complaint is Botfly, LLC.

12. Botfly is a Florida limited liability company with its principal place of business listed in Pasco County Florida.

13. Venue for this action is proper in Pasco County, Florida, pursuant to Chapter 47, Florida Statutes.

14. The Complaint is brought to accomplish the Order Appointing Receiver and this action is ancillary to the Circuit Court's exclusive jurisdiction over the Receivership Entities.

15. The Circuit Court has subject matter jurisdiction as the action arises from the Enforcement Action and the Defendant received assets transferred from the Receivership Entities that belong to the Receivership Estate.

## GENERAL ALLEGATIONS

16. At all material times alleged herein Botfly was under the dominion and control of Lewalski.

17. Lewalski, in complicity with others, operated Botfly as the instrument of a fraudulent Ponzi scheme whereby capital contributions made to Botfly by investors were used to repay earlier investors as well as fictitious profits and commissions or referral fees.

18. Botfly made payments to its investors to perpetuate the illusion that Botfly had positive investment gains, to keep existing investors from seeking recovery of their equity investments, and to induce prospective investors to make new equity investments.

19. Payments made to Botfly investors were made with the actual intent to defraud.

20. On or about July 29, 2011, Lewalski entered a plea of guilty to mail fraud pursuant to a plea agreement. *United States v. Lewalski,* case no. 8:10-cr-00501-T-27MAPIn his

plea agreement, Lewalski agreed that the following facts were true and that the United States would be able to prove them at trial beyond a reasonable doubt:

> The defendant, David R. Lewalski, was the founder, trader, and promoter of Botfly, LLC (hereinafter "Botfly"), a Florida limited liability company incorporated on or about September 13, 2005, with a principal place of business at 12709 Clocktower Parkway, Bayonet Point, in the Middle District of Florida.
>
> The defendant willfully engineered and executed a scheme to defraud by promising victim investors that he could generate returns of up to 10% per month, compounded monthly, through his trading in the foreign currency ("forex") market. In fact, the defendant operated a Ponzi scheme. The defendant and others working at his direction raised approximately $29,851,598.34 from victim investors, but the defendant used only a small percentage of those funds for forex trading (approximately $2.6 million), the vast majority of which he lost.
>
> Instead of trading in the foreign currency market as he promised, the defendant used the bulk of victim investor funds to make payments to other investors in order to perpetuate the scheme and make it appear as if he was generating the promised returns. Specifically, the defendant paid investors $14,339,887.23 in "returns" that he lead them to believe were generated by his forex trading when, in reality, he was merely paying them with other victim investors' funds. The defendant also spent millions of dollars of victim investor funds for personal expenses, including high end real estate, private jet travel, luxury automobiles, computer equipment and jewelry.

21. On November 17, 2011, a United States District Court Judge sentenced Lewalski to serve a term of twenty years' imprisonment.

22. On December 2, 2011, in the Enforcement Action, the Circuit Court entered a Consent Final Judgment that was stipulated to by Lewalski in his personal capacity and as President of Botfly and thereby admitted liability on the claims brought by the OAG in the Enforcement Action. In particular, Lewalski admitted that the Botfly investment program was a Ponzi scheme used to defraud investors and agreed the entry of a judgment in the amount of

$19,240,372.75 representing restitution owed to victims of the Ponzi scheme.

23. Also on December 2, 2011, the Circuit Court entered Summary Final Judgment against Hammill and his company, Jon J. Hammill, P.A. ("**Hammill, P.A.**"), finding that the undisputed facts established that (a) Hammill began working for the Botfly Ponzi scheme as early as December 1, 2008, (b) Hammill solicited investors to invest in Botfly, LLC, and (c) from December 1, 2008 forward, the Ponzi scheme netted the amount of $12,482,575 from investors. The Circuit Court entered judgment in the amount of $19,240,372.75 as to Lewalski and Botfly $12,482,757.00 as to Hammill; and $1,283,717.00 as to Hammill, P.A.

## THE PONZI SCHEME

24. Since the formation of Botfly, Lewalski and others engaged in a scheme to defraud in which he solicited approximately $30 million from at least 500 investors by offering investors the opportunity to participate in an investment program that purported to generate guaranteed monthly returns through foreign currency exchange ("**Forex**") trading.

25. Hammill, as an agent and authorized representative of Botfly, assisted Lewalski in implementing and carrying out the fraud.

26. Hammill, a car salesman by trade, in or around November 2008 went to work for Lewalski as a promoter of Botfly. Hammill realized substantial gains from his role with Botfly.

27. Lewalski, Hammill, and others, promised potential investors that Botfly would to repay the principal amount invested on demand and that Botfly would pay a guaranteed monthly interest rate on the principal amount invested in Botfly.

28. Lewalski, Hammill, and others, falsely represented to potential investors that the guaranteed returns were produced by Botfly's successful Forex trading.

29. Lewalski or Hammill provided Botfly investors with promissory notes which

claimed that the principal amount invested was to "be held for investment and margin purposes only."

31. The guaranteed monthly return was as much as 10% of the amount invested; equating to an annual return of greater than 300% if no disbursements were made of the principal amount invested.

32. The monthly rate of return promised greatly exceeded the prevailing market rates at the time it was offered.

33. In fact, Lewalski did not transfer the majority of the funds paid by investors for investments in Botfly to Forex trading accounts, Botfly did not earn profits from the Forex trading, and the limited Forex trading conducted by Lewalski for Botfly resulted in substantial losses.

34. Lewalski opened and managed Botfly's Forex trading accounts.

35. For every dollar paid to Botfly by an investor, less than 5 cents was used for Forex trading.

36. From October 2005 until April 2010, Lewalski deposited only approximately $1.4 million of the money paid to Botfly by investors into Botfly Forex trading accounts.

37. Lewalski opened a Forex trading account for Botfly in October 2005 with IFX Markets. By the end of 2006, Botfly had received approximately $250,000 from Investors. Yet, Lewalski transferred only $40,000 to the Botfly account at IFX Markets.

38. By the end of 2007, Investors had paid Botfly almost $500,000. No transfers were made to the IFX Account or any other Forex trading account for Botfly during 2007.

39. During 2008 Lewalski opened three more Forex trading accounts for Botfly; an account with Peregrine Financial Group in July, and two accounts with Deutsche Bank AG in August and September. By the end of 2008, Botfly had received approximately $2.8 million

from Investors but at that time Lewalski had transferred a total of $330,000 of the money paid by the Investors to the Botfly Forex accounts.

40. By the end of 2009, Botfly had received more than $20 million from Investors but Lewalski had transferred only $700,000 to the Botfly Forex trading accounts. When the Receiver was appointed on April 1, 2010, only $1.4 million of the approximately $30 million paid by Investors was transferred to a Botfly Forex trading account.

41. Payments made to Botfly investors were not from profits earned from Forex trading.

42. Trading losses were sustained in every one of the four Forex accounts created for Botfly. The combined loss resulting from the trading conducted in the four accounts was approximately 75% of the amount traded.

43. Botfly's bank account records demonstrate that Lewalski and Hammill were transferring investor funds into their own personal accounts and using the funds for other than investment or margin purposes.

44. Lewalski transferred millions of dollars of investor funds to himself, his family, and his associates.

45. Hammill and Hammill, P.A. received approximately $1.3 million from Botfly bank accounts.

46. Through Botfly, therefore, Lewalski, Hammill, and others, operated a Ponzi scheme.

47. To conceal and perpetuate the fraud, Lewalski, Hammill, and others, provided investors with false account statements, including false account statements provided through Botfly's website, misrepresenting that the investor accounts were increasing by their respective

guaranteed rates, when, in fact, to a large extent the money had been disbursed to themselves and to other investors.

48. In furtherance of the Ponzi scheme, and despite the fact that the promised monthly returns were entirely fabricated, Lewalski, Hammill, and others, intentionally and wrongfully caused Botfly to pay investors the purported returns on their investments.

49. Likewise, following requests from investors for redemptions of their principal investments, in furtherance of the Ponzi scheme, Lewalski, Hammill, and others intentionally and wrongfully caused Botfly to pay relevant investors sums of money that were equivalent to all or part of the principal invested by those investors.

50. In addition, in furtherance of the Ponzi scheme, certain investors were paid commissions or referral fees in the amount of 10% of funds paid by new investors (the "**Commission**").

51. Certain investors also arranged to have some of the guaranteed interest paid for the investment of other investors allocated to their own accounts thereby receiving payment of the Commission and of a portion of the interest that purportedly accrued monthly for the investment.

52. These distributions, and all other distributions, which Lewalski and Hammill caused Botfly to make to investors were paid from the fruits of the scheme. They were paid almost exclusively from: (i) principal investment money from new investors; (ii) existing investors' principal investment money; and (iii) additional principal investment money from existing investors.

53. These distributions were not distributions of actual Forex trading profits or of the recipients' principal investments.

54. By intentionally and wrongfully causing Botfly to pay these amounts to investors, Lewalski and Hammill improperly diverted Botfly's assets to perpetrate and perpetuate the scheme.

55. A number of investors in Botfly received no distributions from Botfly of purported trading or other investment profits and/or of purported principal redemptions, or they received such distributions in an amount that was less than the amount they invested. Such investors suffered a net loss.

56. On the other hand, a number of investors received distributions from Botfly of purported trading profits and/or of purported principal redemptions in an amount that exceeded the amount they invested. Each of those investors experienced a net gain, which is referred to herein as "false profits."

57. Botfly was harmed by this unauthorized course of conduct, which was effectuated by Lewalski and Hammill. This conduct dissipated Botfly's assets.

## TRANSFERS TO THE DEFENDANTS

58. The Defendants were among the investors who received false profits in the form of purported interest on their principal investments and/or Commissions in amount which exceeded their principal investments.

59. As detailed in Exhibit A, based on the records reviewed by the Receiver as of the filing of this Complaint, in 2009 and 2010, Lewalski caused Botfly to pay purported interest, principal redemptions, and/or Commissions to the Defendants.

60. Most of the transfers were made directly to the Defendants, but some were made to the account of another and then immediately transferred by the Defendants to themselves.

61. All money Lewalski wrongfully caused Botfly to transfer or pay to the

Defendants was diverted and misappropriated by Lewalski in furtherance of his scheme. Thus, all of the money transferred or paid to the Defendant was improperly diverted assets of Botfly.

### DEFENDANTS WERE ON NOTICE THAT LEWALKSI WAS OPERATING BOTFLY AS A PONZI SCHEME

62. Robert Stead and Kelly Stead are sophisticated investors with knowledge of the investment market.

63. Because Robert Stead and Kelly Stead are sophisticated investors, they knew or should have known that forex trading was a high-risk investment that cannot rationally be guaranteed.

64. Because Robert Stead and Kelly Stead are sophisticated investors, they knew or should have known that Botfly could not guarantee the promised monthly returns unless the monthly returns were funded through subsequent investments.

65. Because Robert Stead and Kelly Stead are sophisticated investors, they knew or should have known that such an aggressive program of solicitation of new investors, coupled with commissions paid for referrals, was indicative of a Ponzi scheme whereby subsequent investments were required to fund monthly returns on prior investments.

66. Robert Stead and Kelly Stead were on notice of the existing indicia of a fraudulent Ponzi scheme, but failed to make sufficient inquiry.

67. Instead, Robert Stead and Kelly Stead promoted and solicited the investment in Botfly to others.

68. All money Lewalski wrongfully caused Botfly to transfer or pay to Defendants, was diverted and misappropriated by Lewalski in furtherance of his scheme. Thus, all of the money transferred or paid to Defendants was improperly diverted assets of Botfly.

## DESPITE BEING ON NOTICE THAT BOTFLY WAS BEING OPERATED AS A PONZI SCHEME, THE DEFENDANTS FAILED TO MAKE DILIGENT INQUIRIES INTO THE NATURE OF BOTFLY

69. The above described facts were sufficient indicia of fraud to place Robert Stead and Kelly Stead on inquiry notice and give rise to a duty for them to make diligent inquiry into the nature of Botfly's business operations.

70. Despite the presence of indicia of fraud, Robert Stead and Kelly Stead failed or refused to make adequate inquiry.

71. Robert Stead and Kelly Stead received fictitious profits, prepayment of principal and/or monies from subsequent investors after being placed on inquiry notice by the indicia of fraud and with out making any reasonable inquiry.

72. Under the circumstances alleged herein, to allow Robert Stead and Kelly Stead to keep any Botfly Payments made directly to them or subsequently transferred to them or for their benefit would be inequitable and unjust, including to the investors of Botfly as a whole.

73. The Receiver seeks to avoid all transfers to Defendants under the Florida Uniform Fraudulent Transfer Act, Fla. Stat. § 726.101 et seq. ("FUFTA"). In the alternative, the Receiver seeks disgorgement of that amount pursuant to equitable claims of unjust enrichment.

## COUNT I
### Florida Statutes § 726: Uniform Fraudulent Transfer Act False Profits

74. The Receiver realleges and reincorporates paragraphs 1 through 72, as if fully set forth herein.

75. By intentionally and wrongfully causing Botfly to transfer to the Defendants investors' commingled principal investment money in an amount equivalent to the total amount paid to the Defendants under the circumstances alleged in this Complaint, Botfly, through the Receiver, has a right to repayment of at least that amount from the Defendants.

76.     In light of this right to repayment, Botfly has a claim against Lewalski and consequently is a creditor of Lewalski under FUFTA. Accordingly, Lewalski is a debtor under FUFTA.

77.     The transfers of funds that Lewalski caused Botfly to make to the Defendants were inherently fraudulent, because the transfers were made as part of the scheme.

78.     Those transfers were fraudulent under Florida Statutes § 726.105(1)(a), because Lewalski caused Botfly to make the transfers with actual intent to hinder, delay, or defraud creditors of Lewalski and/or Botfly.

79.     Those transfers were also fraudulent under Florida Statutes §726.105(1)(b), because: (a) Lewalski caused Botfly to make those transfers; and (b)(i) Lewalski and/or Botfly were engaged or were about to engage in a business or transaction for which their remaining assets were unreasonably small in relation to the business or transaction; or (ii) Lewalski intended that he and/or Botfly incur, or believed or reasonably should have believed they would incur, debts beyond their ability to pay as they became due.

80.     Those transfers were also fraudulent under Florida Statutes § 726.106(1), because neither Lewalski nor Botfly received a reasonably equivalent value in exchange for those transfers to the Defendant and Lewalski and/or Botfly were insolvent at all relevant times.

81.     On behalf of Botfly from which money was transferred to the Defendants as identified in Exhibit A, the Receiver is entitled to avoid and recover transfers equal to the amount that Lewalski caused Botfly to make to the Defendants and to any other remedy, including those available under Florida Statutes § 726.108.

82.     All conditions precedent to this cause of action have been occurred, been satisfied, or have been waived.

WHEREFORE, the Receiver asks this Court to enter judgment against the Defendants avoiding transfers from Botfly in the amount paid to the Defendants, together with interest and costs, and for such other and further relief as the Court may deem just and proper.

## COUNT II
### Unjust Enrichment

83. The Receiver realleges and reincorporates paragraphs 1 through 72, as if fully set forth herein.

84. This unjust enrichment claim is asserted in the alternative, in the event the statutory remedy asserted in Count I does not provide an adequate remedy at law.

85. The Defendants received a benefit when in furtherance and during the course of the scheme, Lewalski wrongfully caused Botfly to transfer money to the Defendants in an amount equal to the amount received by the Defendants, including, but not limited to the transfers on Exhibit A.

86. The Defendants knowingly and voluntarily accepted and retained a benefit in the form of those transfers.

87. The circumstances alleged in this Complaint render the Defendants' retention of that benefit inequitable and unjust, including to the investors of Botfly as a whole, so Defendants must pay the Receiver, acting on behalf of Botfly, the value of the benefit received.

88. The Defendants have been unjustly enriched at the expense of Botfly, and, ultimately, its investors, in the amount of the transfers made to the Defendants, and Botfly, through the Receiver, is entitled to judgment in the total amount of those transfers.

88. The Receiver, on behalf of Botfly, is entitled to the return of that money through disgorgement or any other applicable remedy.

89. All conditions precedent to this cause of action have been occurred, been

satisfied, or have been waived.

WHEREFORE, the Receiver asks this Court to enter judgment against the Defendants in the amount of the transfers made to the Defendants, together with interest and costs, and for such other and further relief as the Court may deem just and proper.

## COUNT III
Equitable Lien

90. The Receiver realleges and reincorporates paragraphs 1 through 72, as if fully set forth herein.

91. This cause of action is to impose an equitable lien against the Botfly Payments and any other funds transferred from Botfly to Defendants in connection with investments in Botfly.

92. Through the operation of Botfly as a fraudulent Ponzi scheme, Botfly paid Defendants in connection with Defendant's promotion of the scheme.

93. The Botfly Payments received by Defendants were made with actual intent to hinder, delay and defraud Botfly's creditors.

94. Thus, the Botfly Payments to Defendants were obtained by fraud.

95. There is a limited fund from which to satisfy all of Botfly's obligations to investors and creditors.

96. Some investors received fictitious profits, existing investors' original principal and/or money invested by subsequent investors from Botfly, while other investors received nothing at all.

98. It is fair and equitable that an equitable lien be imposed on fictitious profits, existing investors' original principal and/or money invested by subsequent investors paid to

promoters Botfly who knew or should have known that it was a Ponzi scheme, and equally distributed among all investors.

99. Defendants are possession of traceable funds transferred from Botfly which represent payment of fictitious profits, existing investors' original principal and/or money invested by subsequent investors.

100. Defendants were unjustly enriched by the Botfly Payments.

101. The Receiver has no adequate remedy at law.

102. Based upon the allegations set forth herein, equity requires the imposition of an equitable lien in favor of the Receiver for the benefit of the Receivership, as against all funds or other things of value that constituted the Botfly Payments, or the proceeds or products of the Botfly Payments.

WHEREFORE, the Receiver demands that this Court impose an equitable lien against Defendants upon the Botfly Payments and any other transfer of funds, assets, or property traceable to Botfly, and all products and proceeds thereof, in favor of the Receiver for the benefit of the Receivership, together with interest and costs, and for such other and further relief as the Court may deem just and proper.

## COUNT VI
### Constructive Trust

103. The Receiver realleges and reincorporates paragraphs 1 through 72, as if fully set forth herein.

104. This cause of action is to impose a constructive trust against the Botfly Payments and any other funds transferred by Botfly to Defendants in connection with investments in Botfly.

105. Through the operation of Botfly as a fraudulent Ponzi scheme, Botfly paid the

Botfly Payments in connection with Robert Stead and Kelly Stead's promotion of the scheme.

106. The Botfly Payments received by Defendants were made with actual intent to hinder, delay and defraud Botfly's creditors.

107. Thus, the Botfly Payments to Defendants were obtained by fraud.

108. Defendants were on notice of the existing indicia of a fraudulent Ponzi scheme, but failed to make sufficient inquiry.

109. There is a limited fund from which to satisfy all of Botfly's obligations to investors and creditors.

110. Some investors received fictitious profits, existing investors' original principal and/or money invested by subsequent investors from Botfly, while other investors received nothing at all.

111. It is fair and equitable that a constructive trust be imposed on fictitious profits, existing investors' original principal and/or money invested by subsequent investors paid to promoters Botfly who knew or should have known that it was a Ponzi scheme, and equally distributed among all investors.

112. Defendants are in possession of traceable funds transferred from Botfly which represent payment of fictitious profits, existing investors' original principal and/or money invested by subsequent investors.

113. Defendants were unjustly enriched by the Botfly Payments.

114. The Receiver has no adequate remedy at law.

115. Based upon the allegations set forth herein, equity requires the imposition of a constructive trust lien in favor of the Receiver for the benefit of the Receivership, as against all

funds or other things of value that constituted the Botfly Payments, or the proceeds or products of the Botfly Payments.

WHEREFORE, the Receiver demands that this Court impose a constructive trust against Defendants upon the Botfly Payments and any other transfer of funds, assets, or property traceable to Botfly, and all products and proceeds thereof, in favor of the Receiver for the benefit of the Receivership, together with interest and costs, and for such other and further relief as the Court may deem just and proper.

Dated: February 24th, 2012

BUSH ROSS, P.A.
P.O. BOX 3913
Tampa, FL 33601-3913
Telephone: (813) 224-9255
Facsimile: (813) 223-9620
*Counsel for the Receiver*


By: *Karen Cox*
Karen Cox, Esq.
Florida Bar No. 456667

## EXHIBIT "A"

## BOBBY AND KELLY STEAD TRANSFERS

| Transaction Date | Withdrawal |
|---|---|
| 12/20/2007 | $500.00 |
| 1/14/2008 | $2,000.00 |
| 1/28/2008 | $3,000.00 |
| 4/29/2008 | $2,000.00 |
| 6/11/2008 | $7,800.00 |
| 8/11/2008 | $7,500.00 |
| 9/25/2008 | $2,700.00 |
| 3/9/2009 | $3,000.00 |
| 2/9/2009 | $4,000.00 |
| 4/3/2009 | $25,000.00 |
| 4/3/2009 | $25,000.00 |
| 4/3/2009 | $50,000.00 |
| 4/24/2009 | $20,000.00 |
| 5/4/2009 | $50,000.00 |
| 5/5/2009 | $25,000.00 |
| 5/5/2009 | $25,000.00 |
| 5/26/2009 | $1,000.00 |
| 6/3/2009 | $45,000.00 |
| 6/25/09 | $750.00 |
| 6/30/2009 | $93,300.00 |
| 7/29/2009 | $16,000.00 |
| 11/9/2009 | $2,700.00 |
| 11/25/2009 | $6,000.00 |
| 12/8/2009 | $3,000.00 |
| 12/24/2009 | $11,000.00 |
| 1/26/2010 | $1,200.00 |
| 2/25/2010 | $750.00 |
| 3/26/2010 | $80,000.00 |
| | $513,200.00 |

17

1118004.1